UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Timothy G. Murry,

    Plaintiff,

v.                                                                     Civ. No. 05-1836 (JNE/JJG)
                                                                     ORDER

Cannon Valley Cooperative,

    Defendant.

---

Nicholas G.B. May, Esq., May & O'Brien, LLP, appeared for Plaintiff Timothy G. Murry.

Patrick M. Biren, Esq., Brownson & Ballou, PLLP, appeared for Defendant Cannon Valley Cooperative.

---

This is an action by Timothy Murry against his former employer, Cannon Valley Cooperative (CVC), under the Family Medical Leave Act (FMLA) and the Minnesota Human Rights Act (MHRA). Murry maintains that CVC violated the FMLA by failing to reinstate him after his FMLA leave and terminating his employment. Murry also asserts that CVC violated the MHRA by discharging him because of his disability and failing to reasonably accommodate his disability. The case is before the Court on CVC's Motion for Summary Judgment. For the reasons set forth below, the Court denies the motion.

**I.    BACKGROUND**

In 1993, Murry began working as a laborer at Dennison Mill & Grain, which is located in Dennison, Minnesota. CVC purchased Dennison Mill & Grain in 1997 and continued to employ Murry as a laborer. In 1998, CVC promoted Murry to Location Supervisor at CVC's Dennison facility. Murry's responsibilities as Location Supervisor included: (1) sales and service to customers in feed, seed, and agronomy products; (2) assist farmers in marketing their grain; (3)

1

assist CVC's Credit Manager in approving customer credit and collecting accounts; (4) maintain products in neat and orderly manner; (5) supervise all aspects of elevator operation (*e.g.*, dumping grain, preventive maintenance, cleaning, drying and binning grain, and loading trucks); and (6) deliver products. Murry held the position until his termination in October 2004.

In the months leading up to his termination, Murry experienced severe health issues. In May 2004, he developed a kidney infection that required his hospitalization in early June. After his discharge from the hospital, Murry returned to work until late July.

In late July 2004, Murry felt weak and had difficulty breathing. He sought medical treatment and spent approximately three weeks in a hospital, two of them in a medically induced coma. An infection in the space around his lungs caused an empyema with subsequent pneumonia. For more than three weeks after his discharge, Murry received intravenous antibiotics four times per day and used an oxygen machine at night.

In August 2004, Kimberly Jones, an administrative assistant who assisted with human resources issues, began helping Murry with an application for long-term disability (LTD) benefits. On September 3, 2004, Murry called Jones to ask questions about the application. In her notes of the conversation, Jones wrote that Murry had asked about borrowing vacation time from CVC and that CVC would likely deny his request "since his return to work was not in the near future."

On September 10, 2004, shortly after the conclusion of his antibiotic treatment, Murry had an appointment with Dr. James Flink. Dr. Flink had treated Murry after his discharge from the hospital. During that appointment, Murry asked about his ability to return to work. Murry described the Dennison facility and his responsibilities as its Location Supervisor. Dr. Flink notified Murry that he could return to work. The next day, Murry informed James Dell, the

2

manager of CVC's grain department, of his ability to return to work. Dell responded that Murry would be assigned to CVC's facility in Northfield, Minnesota, and that CVC required a note from his doctor before he could return to work. According to Murry, Dell declined to state what Murry's duties at the Northfield facility would be.

After speaking to Dell, Murry scheduled appointments with Dr. Flink to determine how his lungs would react to irritants. After testing Murry, Dr. Flink issued the following note on September 28, 2004: "Mr. Murry has sensitive lungs and sensitive airways. He may have asthma—He needs to work in clean air."

The next day, Murry called Clifton Gipp, CVC's general manager. Murry stated that he had obtained a note from his doctor and that the note cleared him to return to work. By agreement, Murry brought the note to the Dennison facility.

CVC contacted Murry approximately three weeks later. Specifically, Gipp called Murry and asked to meet. They met at the Dennison facility, and CVC terminated Murry's employment. CVC explained its decision in a letter dated October 21, 2004, that Gipp gave to Murry at the meeting:

> During this summer, you have been absent from work for health related reasons. In addition to taking twelve days of leave in May/June, you have been continuously out of work since July 27, 2004, under the care of your physician. [CVC] has allowed you to take vacation leave during these absences. In addition, these absences have qualified under [CVC's] Family Medical Leave policy.
>
> You have used up all of your accrued and earned vacation leave in September. Your 12 weeks of unpaid Family Medical leave has also exhausted. Since the expiration of your Family Medical leave, [CVC] has continued to keep your position open for you to return to work. You recently provided us, though, with a note from your physician that you cannot return to work in your capacity as Location Supervisor because you must work in a dust free and chemical free environment.
>
> [CVC] does not have a position available with job duties and responsibilities that will meet the restrictions placed on you by your physician. Because we do not have a job for you to perform within your restrictions and all

3

of your vacation and Family Medical leave has been used, [CVC] is ending your employment.

Less than two months after Murry's termination, on December 14, 2004, Dr. Flink wrote the following diagnosis of Murry:

> Mr. Tim Murry developed a pulmonary condition called the acute respiratory distress syndrome, otherwise known as ARDS. This condition is really a syndrome and not one specific disease. There are a multitude of different problems that can lead to this type of injury to the lung. In Mr. Murry's case, I think it was infection. Specifically, the infection in the space around the lung caused an empyema with subsequent pneumonia. While this is a severe and life-threatening problem, and in Mr. Murry's case resulted in the need for a respirator, Mr. Murry improved fairly rapidly, was able to leave the hospital, and no longer requires oxygen.
>
> Mr. Murry's breathing tests since then have shown that his lungs have not returned to normal and furthermore that his lungs are sensitive. The technical term is that he has reactive airways and this is an asthma-like syndrome. I cannot tell you whether or not he has asthma, but I need to treat him as if he does. That treatment includes avoiding inhalation of irritants and therefore my recommendation that he work in an environment that has clean air. The concept of clean air does not have measurement, but with common sense includes the absence of smoke, visible dust, and strong chemical irritants such as ammonia. Providing clean air is not always possible in the workplace. Even with respiratory protection, some patients have a pulmonary reaction and end up having symptoms anyway. Certainly, a grain elevator is not the type of environment that I would expect anybody with asthma to be able to tolerate with or without respiratory protection.
>
> It is unknown to me whether or not Mr. Murry will improve to the point that he no longer has reactive airways and no longer reacts to the environment and would be able to control his breathing symptoms without medication. Presumably, we will discover that over the course of the next year. Generally speaking, we consider the full and complete resolution of ARDS to take 12 months.
>
> There are a variety of respiratory protective devices, which can protect against specific inhalation exposures. That is, there are masks that effectively protect against the inhalation of dust. There are additional masks and filters that can protect against specific chemicals. The availability of these protective devices comes through Industrial Hygienists. The provision of a half facemask with specific cartridges should be available to Mr. Murry through his employer. On the other hand, it is not everyone that can tolerate using this type of mask. An appointment with an Industrial Hygienist would allow him to try it. Being able to

wear them at rest does not necessarily make one able to work and do labor with the mask on.

If Mr. Murry is provided with such a mask, he should be given a chance to work in the previous work environment. If, on the other hand, he is unable to tolerate such a mask, he might be given a trial of exposure with continued medication and observation of his pulmonary response before and after such exposures.

If we can show that his lung does not react either by protection or medication or both, then continued employment would be appropriate. If he is unable to wear a mask and work, it is unreasonable to expect a grain elevator to provide clean air.

From December 2004 to May 2005, Murry received LTD benefits from CVC's insurer. On May 22, 2005, he executed a Release in exchange for a lump sum payment. In the Release, Murry asserts that he is "totally disabled from performing [his] Own Occupation (as that term in defined by the Policy) as a production foreman, but acknowledge[s] that [he is] able to perform one or more occupations other than [his] Own Occupation." Approximately two months after executing the Release, Murry brought this action.

## II. DISCUSSION

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party "bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, Rule 56(e) requires the nonmoving party to respond by submitting evidentiary materials that designate "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In determining whether summary judgment is appropriate, a court must look at

5

the record and any inferences to be drawn from it in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

**A.      FMLA**

The FMLA entitles an eligible employee to take up to twelve weeks of leave during a twelve-month period due to "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D) (2000); *see Throneberry v. McGhehee Desha County Hosp.*, 403 F.3d 972, 977 (8th Cir. 2005). Upon completion of the leave, the employee is generally entitled to be restored to the position held before the leave or its equivalent. 29 U.S.C. § 2614(a)(1) (2000); *see Throneberry*, 403 F.3d at 977. "Because the FMLA grants valuable leave and restoration rights to eligible employees, it also secures these rights against unlawful infringement." *Throneberry*, 403 F.3d at 977. Under the FMLA, it is "unlawful for an employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" under the FMLA. 29 U.S.C. § 2615(a)(1) (2000). It is also "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by" the FMLA. *Id.* § 2615(a)(2). A violation of section 2615(a)(1) "creates what is commonly known as the interference theory of recovery." *Throneberry*, 403 F.3d at 977. A violation of section 2615(a)(2) "creates what is commonly known as the discrimination theory of recovery." *Id.* "Confusion often arises as to whether an employees' FMLA claim" is one for interference or discrimination. *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1051 (8th Cir. 2006). "The difference between the two claims is that the interference claim merely requires proof that the employer denied the employee his entitlements under the FMLA, while the retaliation claim requires proof of retaliatory intent." *Id.*

CVC does not separately address the theories of recovery available under the FMLA. It asserts that it did not violate the FMLA because it granted Murry leave under the FMLA, Murry did not provide it with a doctor's note that cleared him to return to work, Murry was not able to return to work, and Murry's termination took place after he had exhausted his FMLA leave. Murry disputes the amount of FMLA leave he took. He also maintains that CVC could not require medical certification as a condition of his restoration, that a doctor's note nevertheless cleared him to return to work, and that he was able to perform the essential functions of the Location Supervisor at the Dennison facility.

The dispute about the amount of FMLA leave taken by Murry relates to his absences from work in May and June 2004. In his Complaint, Murry alleges that he "took an employer approved medical leave from work between May 12, 2004 and June 7, 2004." During that time, he missed ten days of work. Although Murry now asserts that medical leave accounts for three of the ten days and that vacation accounts for the rest, he is bound by his Complaint's factual allegations. *See Nat'l Sur. Corp. v. Ranger Ins. Co.*, 260 F.3d 881, 886 (8th Cir. 2001); *Knudsen v. United States*, 254 F.3d 747, 752 (8th Cir. 2001); *Mo. Hous. Dev. Comm'n v. Brice*, 919 F.2d 1306, 1314-15 (8th Cir. 1990). Consequently, the record reveals that Murry took at least two weeks of FMLA leave as of June 7, 2004.

The parties do not dispute that Murry next took FMLA leave on July 28, 2004. More than six weeks later, on September 11, 2004, Murry informed CVC of his ability and intent to return to work. CVC responded by directing him to submit a doctor's note that cleared him to work. Murry contends that CVC did not have the right to condition his return to work on submission of a doctor's note.

"As a condition of restoration . . . for an employee who has taken leave under section 2612(a)(1)(D) . . . the employer may have a uniformly applied practice or policy that requires each such employee to receive certification from the health care provider of the employee that the employee is able to resume work . . . ." 29 U.S.C. §2614(a)(4). Under the applicable regulation, the employer must notify the employee of the requirement for fitness-for-duty certification. 29 C.F.R. § 825.310(e) (2006) ("Specific notice shall also be given to any employee from whom fitness-for-duty certification will be required either at the time notice of the need for leave is given or immediately after leave commences and the employer is advised of the medical circumstances requiring the leave . . . ."). "An employer may delay restoration to employment until an employee submits a required fitness-for-duty certification unless the employer has failed to provide the notices required" by section 825.310(e). *Id.* § 325.310(f). In this case, Dell testified that CVC requires a medical release from every employee who seeks to return from medical leave. CVC does not direct the Court to any evidence that CVC gave Murry notice of its requirement of a fitness-for-duty certification pursuant to section 825.310(e), and Murry's deposition testimony can be fairly read to indicate that he first learned of the requirement when he notified CVC on September 11, 2004, of his ability and intent to return to work. Viewing the record in the light most favorable to Murry, the Court concludes that CVC could not delay Murry's restoration pending submission of a fitness-for-duty certification. *See id.*

Even if CVC could condition Murry's restoration on submission of a fitness-for-duty certification, Murry maintains that he satisfied the requirement by submitting the doctor's note on September 29, 2004. As noted above, the note states: "Mr. Murry has sensitive lungs and sensitive airways. He may have asthma—He needs to work in clean air." CVC contends that the

8

note was insufficient. Under the relevant regulation, a fitness-for-duty certification "need only be a simple statement of an employee's ability to return to work." *Id.* § 825.310(c). Murry's ability to return to work can be fairly inferred from the note. *Cf. Bloom v. Metro Heart Group of St. Louis, Inc.*, 440 F.3d 1025, 1030 (8th Cir. 2006) (characterizing doctor's note as "too vague and conditional to constitute a statement that [plaintiff] was fit-for-duty"); *Brumbalough v. Camelot Care Ctrs., Inc.*, 427 F.3d 996, 1004 (6th Cir. 2005) ("[W]e hold that once an employee submits a statement from her health care provider which indicates she may return to work, the employer's duty to reinstate her has been triggered under the FMLA."). Accordingly, the Court rejects at this time CVC's contention that Murry failed to provide a fitness-for-duty certification.

Notwithstanding the note provided by Murry, if the restriction placed on him—"clean air"—rendered him unable to perform the essential functions of his position as Location Supervisor, CVC had no obligation to restore his employment. *See Bloom*, 440 F.3d at 1030; *Brumbalough*, 427 F.3d at 1004 n.4; *Reynolds v. Phillips & Temro Indus., Inc.*, 195 F.3d 411, 414 (8th Cir. 1999). "Essential functions of the job are 'fundamental job duties,' and the employer's judgment in this regard is considered 'highly probative.'" *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 786 (8th Cir. 2004). Evidence to consider in determining whether a job duty is essential may include: (1) the employer's judgment as to which duties are essential; (2) written job descriptions; (3) the amount of time spent performing the duty; (4) the consequences of not requiring the performance of the duty; and (5) the current work experience of those in similar jobs. *Id.*; *Heaser v. Toro Co.*, 247 F.3d 826, 831 (8th Cir. 2001).

According to CVC, "handling chemicals and grain" is an essential function of the Location Supervisor at the Dennison facility. To support its contention, CVC relies on the position's job description and the deposition testimony of Gipp. According to Gipp, the duties of

the Location Supervisor at the Dennison facility include physical labor. He noted the following duties from the job description: (1) "[m]aintains products in a neat and orderly manner"; (2) "[m]aintains supervision in all aspects of elevator operations (dumping grain, preventive maintenance, cleaning top to bottom, drying grain, binning grain, loading trucks as assigned)"; and (3) "[m]akes product deliveries and facilitates grain hauling logistics of location on an as needed basis." As part of the facilitation of grain hauling logistics, Gipp testified that the Location Supervisor had to load grain onto trucks or unload grain from trucks. Because the Location Supervisor worked with one or two other full-time employees at the Dennison facility, Gipp asserted that the Location Supervisor had to be "physically involved" in dumping grain, preventive maintenance, cleaning, and drying grain. Gipp admitted that he did not know how much time the Location Supervisor at the Dennison facility devoted to these tasks.

Murry responds that the essential functions of the Location Supervisor at the Dennison facility included neither the handling of chemical and grain nor physical labor. In support, he cites depositions and affidavits of several individuals. For instance, Gipp testified that Murry "was primarily in the office area" during Gipp's visits to the Dennison facility. David Flom, a laborer at the Dennison facility, testified that he performed the vast majority of work outside and that Murry only occasionally worked outside. Dell testified that he would send additional laborers at Murry's request to perform duties such as cleaning and handling grain. In an affidavit, James Black, a former Location Supervisor at the Dennison facility, stated that he rarely worked outside or around dust. Black also stated that his supervisory responsibilities did not require him to dump grain, clean grain bins, work in grain dust, or work with chemicals. Instead, according to Black, CVC sent additional laborers to the Dennison facility to perform tasks that involved exposure to dust or other irritants. Similarly, Murry stated that he performed

the vast majority of his duties as Location Supervisor in the Dennison facility's office. The Court is mindful that an employer's judgment as to which duties of a position are essential is highly probative. *Kammueller*, 383 F.3d at 786. Nevertheless, the employer's judgment is not conclusive. *Id.* Viewing the record in the light most favorable to Murry, a reasonable factfinder could conclude that the essential functions of the Location Supervisor at Dennison include neither handling grain and chemicals nor physical labor.

CVC nevertheless argues that Murry could not perform the essential functions of the Location Supervisor at the Dennison facility. In support, CVC relies on the December 14 diagnosis by Dr. Flink and the May 2005 Release executed by Murry. In the diagnosis, Dr. Flink recommended that Murry work "in an environment that has clean air," one free of "smoke, visible dust and strong chemical irritants." Dr. Flink also stated that Murry's continued employment would be appropriate if either medication or respiratory protection prevented reactions in Murry's lungs, but that it was "unreasonable to expect a grain elevator operator to provide clean air." Given that Dr. Flink reiterated his earlier assessment of Murry's ability to work in clean air and that Dr. Flink issued the diagnosis with the knowledge that CVC had informed Murry that Murry would return to CVC's Northfield facility with unspecified duties, the diagnosis does not preclude a reasonable factfinder from concluding that Murry was able to perform the essential functions of the Location Supervisor at the Dennison facility.

Turning to the May 2005 Release, Murry states in it that he is "totally disabled from performing [his] Own Occupation (as that term in defined by the Policy) as a production foreman, but acknowledge[s] that [he is] able to perform one or more occupations other than [his] Own Occupation." The record does not reveal the Policy's definition of "Own Occupation," and Murry held the position of Location Supervisor before his FMLA. Without

11

more, his assertion that he is totally disabled from working as a production foreman does not prevent him from demonstrating his ability to perform the essential functions of the Location Supervisor. *Cf. Reynolds*, 195 F.3d at 414 n.4.

Murry contends he was able to perform the essential functions of the Location Supervisor at the Dennison facility. There is evidence that the facility's office was neither dusty nor exposed to chemical irritants. Given Dr. Flink's assessments of Murry's ability to work in clean air and the conditions in the office, a reasonable factfinder, viewing the record in the light most favorable to Murry, could conclude that Murry was able to perform the essential functions of the Location Supervisor at the Dennison facility upon the expiration of his FMLA leave. For these reasons, the Court denies CVC's motion as it relates to Murry's FMLA claim.

**B.     MHRA**

Murry first claims that CVC violated the MHRA by discriminating against him on the basis of his disability. Under the MHRA, "it is an unfair employment practice for an employer, because of . . . disability," to "discharge an employee" or to "discriminate against a person with respect to hiring, tenure, compensation, terms, upgrading, conditions, facilities, or privileges of employment." Minn. Stat. § 363A.08, subd. 2(b)-(c) (2004). CVC asserts that it is entitled to summary judgment because Murry cannot establish that he had a disability as defined by the MHRA.

The MHRA defines disability as "any condition or characteristic that renders a person a disabled person." Minn. Stat. § 363A.03, subd. 12 (2004). Any person "who (1) has a physical, sensory, or mental impairment which materially limits one or more major life activities; (2) has a record of such impairment; or (3) is regarded as having such impairment" is a disabled person. *Id.* "The degree to which a condition limits one or more major life activities is evaluated based

on the plaintiff's specific circumstances." *Hoover v. Norwest Private Mortgage Banking*, 632 N.W.2d 534, 543 (Minn. 2001). Here, Murry contends that he had an impairment that materially limited the major life activities of working and breathing.

Work is a major life activity under the MHRA. *Id.*; *Sigurdson v. Carl Bolander & Sons Co.*, 532 N.W.2d 225, 228 (Minn. 1995). The Minnesota Supreme Court set forth the following factors to consider when faced with an assertion that work is the major life activity in which the plaintiff is materially limited:

> (a) the number and type of jobs from which the impaired individual is disqualified, (b) the geographic area to which the applicant has reasonable access, (c) the applicant's own job expectations and training, (d) the criteria or qualifications in use generally, and (e) the types of jobs to which the rejection would apply.

*Hoover*, 632 N.W.2d at 543 (quoting *State by Cooper v. Hennepin County*, 441 N.W.2d 106, 111 (Minn. 1989)). Here, CVC contends that there is no evidence that Murry was disqualified from a broad range of jobs. To buttress its contention, CVC notes that Murry secured employment as a salesman for an agricultural company. The Court notes that Murry obtained the sales position approximately one year after CVC's termination of his employment. To the extent CVC argues that Murry's employment as a salesman precludes him from demonstrating a disability under the MHRA, the Court rejects the argument. *Cf. Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944, 954-55 (8th Cir. 1999) ("Finding that an individual is *substantially* limited in his or her ability to work requires a showing that his or her overall employment opportunities are limited. Thus, the [Americans with Disabilities] Act does not require a showing that absolutely no employment opportunities exist." (citation omitted)).[1] There is evidence in the record that Murry's ARDS materially limits him in the major life activity of working. For instance, Murry's ARDS

---

[1] The MHRA's definition differs from and is less stringent than that of the Americans with Disabilities Act because the MHRA requires a material limitation instead of a substantial limitation. *Hoover*, 632 N.W.2d at 543 n.5.

13

disqualifies him from many jobs in the agricultural industry because the jobs entail exposure to dust and chemicals. Murry lives in Dennison, which is a small rural town. Since the age of 17, Murry has worked in the agriculture industry. He has neither a high school diploma nor a general education development diploma, though he studied agronomy. Viewing the record in the light most favorable to Murry, a reasonable factfinder could conclude that Murry's impairment materially limits him in the major life activity of working.

The same conclusion is warranted with regard to Murry's contention that his impairment materially limits him in the major life activity of breathing. Determination of whether a person is materially limited in a major life activity turns on several factors: (1) the nature and severity of the impairment; (2) its duration or anticipated duration; and (3) its long-term impact. *See Maziarka v. Mills Fleet Farm, Inc.*, 245 F.3d 675, 679 (8th Cir. 2001); *see also Kammueller*, 383 F.3d at 784 (analyzing claims under MHRA and Americans with Disabilities Act under same standards except for definition of disability). In this case, Murry was diagnosed with ARDS in the summer of 2004. Although his condition improved, his lungs had not returned to normal as of December 2004. That month, Dr. Flink expressed uncertainty as to whether Murry would improve to the point where his airways no longer reacted. As of June 2006, Murry continued to experience difficulties with his breathing. For example, he often feels like he is drowning due to an inability to draw sufficient air into his lungs. Cold weather and humid air exacerbate his difficulties breathing. At night, Murry often awakes with headaches due to an inability to draw sufficient oxygen into his lungs. He also experiences shortness of breath when engaged in mild physical activity. Viewing the record in the light most favorable to Murry, a reasonable factfinder could conclude that Murry's impairment materially limits him in the major life activity of breathing. *Cf. Land v. Baptist Med. Ctr.*, 164 F.3d 423, 425 (8th Cir. 1999) (holding allergic

reactions that limited ability to breath did not constitute substantial limitation where ability to breath was otherwise "generally unrestricted"). For these reasons, the Court denies CVC's motion insofar as CVC asserts that Murry cannot demonstrate a disability.

Murry also claims that CVC violated the MHRA by failing to accommodate his disability. Under the MHRA, "it is an unfair employment practice for an employer . . . not to make reasonable accommodation to the known disability of a qualified disabled person . . . unless the employer . . . can demonstrate that the accommodation would impose an undue hardship on the business . . . ." Minn. Stat. § 363A.08, subd. 6. With respect to employment, a qualified disabled person is "a disabled person who, with reasonable accommodation, can perform the essential functions required of all applicants for the job in question." Minn. Stat. § 363A.03, subd. 36. CVC asserts that it is entitled to summary judgment on this claim because Murry is not a qualified disabled person. For the reasons set forth above, a reasonable factfinder, viewing the record in the light most favorable to Murry, could conclude that Murry was able to perform the essential functions of the Location Supervisor at the Dennison facility. Accordingly, the Court denies CVC's motion as it relates to Murry's MHRA claim for failure to accommodate.

## III.   CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. CVC's Motion for Summary Judgment [Docket No. 13] is DENIED.

Dated:  December 26, 2006

s/ Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge
